Case number 20-5416, Nitza Scarbro v. Social Security Administration. Arguments not to exceed 15 minutes per side. Mr. Parker may proceed for the appellant. Thank you. May it please the court, Patrick Parker of the Nashville and Sumner County Tennessee Bar Associations. On behalf of the appellant, Ms. Nitza Scarbro, I had previously arranged with the clerk to reserve five minutes of rebuttal time, but I would move the court to approve the same. All right. If your honor please, the issue that we are here today on this court is whether or not the district court in Nashville erred in granting summary judgment by finding that the appellant failed to demonstrate under the totality of the circumstances that the harassment to which she was subject to in the workplace was severe and pervasive. The honors have had our briefs and have reviewed the same, but I would like to review some pertinent facts of my client's case. Ms. Scarbro worked for the Social Security Administration or has worked for the Social Security Administration for approximately 19 years, beginning in 2001. She ultimately, after several transfers in various regions of the country, eventually became a supervisor in the Title 16 unit in Nashville, Tennessee, and she was in charge of reviewing supplemental Social Security income applications. Beginning in 2010, a gentleman by the name of Mr. Horn became her assistant became the district manager and also her supervisor. It was at this time in 2012 that a co-employee, a gentleman by the name of Mr. Dan Phillips, was hired as a staff assistant who also reported to the same supervisors as Ms. Scarborough. Beginning in October 2012, Mr. Phillips began making comments in the workplace to my client that made her feel uncomfortable, including wanting to discuss his own marriage that he and his wife had and the problems they were having in their marriage to the point where he was discussing with her. But she never complained to anybody about that? I'm sorry? She never complained to anybody about that, did she? Yes, she did. She ultimately told both her supervisors, Mr. Horn and Mr. Bly, reported to this on several different occasions, including this. She reported a lot of statements, I give you that, but the particular one about open marriage, there's nothing in the record, is there, that shows that she reported that? We have that she reported this incident to her, the one about the open marriage to Mr. Horn and Mr. Bly in October 2012. But there's no question that she didn't report that contemporaneously when it happened, did she? No, no, Your Honor. Okay, and secondly, didn't he say to her that he thought they were friends? For that incident alone, Your Honor, I don't have any... Well, no, I don't mean just at the time of that incident. Okay. Before then, he had said he considered them friends. That would be correct in his mind, but in the plaintiff's mind, Your Honor, he found these comments, she found these comments to be inappropriate. But I mean, it wasn't just in his mind, he actually said that to her. Well, the comment, but then he also subsequently was seen in the parking lot, essentially waiting for her after work and doing comments like that, to which she reported those incidents as well. All right, and we want to get into this waiting in the parking lot for her when you talk about what's in someone's mind, and I really don't want to get you off your argument, so just go on with your argument and then we'll ask you questions about that. Sure, and soon after the incident discussing the open marriage, then the perpetrator was in the parking lot and began to wait for her as she began to leave the office after work. One time, there was another employee that was with her who witnessed it, drove up next to her, and then when confronted, he then drove off. That incident was also reported to Mr. Horne and Mr. Blythe that Mr. Phillips was making her feel uncomfortable. This harassment at this time caused my client to become physically ill, nausea, anxiety, migraine headaches, and did interfere with her work. She ultimately confronted Mr. Phillips herself since she was not getting any redress from Mr. Horne or Mr. Blythe and requested that he stop harassing her. The conversation did result in Mr. Phillips saying that he did know that someone in the office had been reporting his conduct. Ultimately, in December 2012, the client did not participate in certain office events where Mr. Phillips would be located, including meetings at the office or there was a hosted Christmas party and that she refused to participate in the same. In January 2013, Mr. Phillips approached her again and asked personal questions concerning her relationship with her husband. Her husband was in the military and was deployed and therefore she would be, of course, here in the States while her husband was deployed away, and he began to ask questions about she and her husband's relationship. Now, was that the point where he asked her how did her husband stand being separated from the children? He basically wanted to know about their relationship and whether that was to be about her and her children. He wanted to know more about her and her husband's relationship. What were the words? Did he say, I want to know more about you and your relationship? I understood him to say, how does your husband stand being away from the children? Am I wrong? No, I'm sorry, Your Honor. The record reflects that the appellant was asked to ask her husband about that. She was asked to inquire as to that with her husband, how he felt about that, and that was the tone of that inquiry or subject matter of that inquiry. Ultimately, all of these facts, Ms. Phillips did numerously complain to her supervisors who ultimately reported there was nothing they could do about the situation. She then ultimately complained to... Didn't for the most part they talk to Mr. Phillips about what he was saying? Yes, apparently they did talk to Mr. Phillips about what he was saying, but what the result of that was never reported back to my client in any form or fashion. There apparently was some discussion admittedly, but what he was instructed to do, not to do, what the boundary lines were based on her reporting that conduct was never reported back to my client. But didn't they make some scheduling adjustments or something after her complaints? Some may have been made, but there was no objective report or finding, I guess, in my client's view of what was to happen in the workplace, where the boundary lines were. Ultimately, she filed her complaint. The district court, in using the analysis, did provide the correct framework of evaluating a hostile work environment case by this court in the case of Hawkins v. Anheuser-Busch with the five-factor test. Specifically, the court focused in on about whether or not the harassment unreasonably interfered with her work performance and created a hostile work environment. The district court cited the case of Virgilio v. Potter in relying on the fact that and then grouping her complaints of about 15 incidents of harassment over a two-and-a-half-year period, stating that the incidents were not severe or pervasive in of themselves. Appellant relies heavily on the case of Gallagher v. C.H. Robinson worldwide, which was decided by this court in 2009, in which this court found that the district court erroneously insisted that harassment was both subjectively and objectively severe and pervasive, and citing Williams v. General Motors, that there has to be a finding that the environment is objectively hostile and the harassment is severe and pervasive. The district court conflated those two, similar in Gallagher, and the way if the court reviews the memorandum opinion of the district court, it was very similar what this court overturned in the Gallagher opinion. I see I'm out of my time on my timer, and I will reserve my remaining comments to my rebuttal. Very well. We'll hear from counsel for defendant. Good morning, and may it please the court. My name is Anika Jones. I'm an assistant United States attorney for the Middle District of Tennessee, and I'm representing Andrew Saul, Commissioner of the Social Security Administration. The district court correctly granted summary judgment in favor of Social Security, and this court should affirm that decision, because the harassment alleged by Ms. Scarborough is not sufficiently severe or pervasive to rise to the level of an actionable hostile work environment under Title VII. This case does not involve any physical touching, no overtly sexual comments, gestures, or jokes. Instead, we have a series of minor, infrequent interactions between coworkers, and no reasonable juror would deem any of the alleged behavior as objectively hostile or abusive. How much cumulative conduct would be required as a baseline for it to become pervasive? Your Honor, the court has held that one incident could be enough, but it must be extremely severe, so the court has set a very high bar and has explicitly stated that this is not a general civility code, so therefore isolated incidents, offhand comments, personality conflicts, these are not the types of actions that rise to the level of severe or pervasive, and so because the bar is so high and the alleged harassment that Ms. Scarborough has put before this court is just simply not meeting that standard, that is why this court should affirm the underlying court's decision. Do you aver that these incidents fall into the category of personality conflicts? Certainly. Yes, Your Honor, I do. Although she has enumerated many events that have occurred between Mr. Phillips and Ms. Scarborough, but the vast majority of them are work-related, they're ordinary interactions, and they have absolutely nothing to do with sexual harassment. For example, Ms. Scarborough complained that on a she was supposed to close the office, Mr. Phillips was still on the phone at 530. That's not harassment. Also, Mr. Phillips had some negative comments about subordinates on Ms. Scarborough's team, and she complained about that. That's not harassment. Mr. Phillips sent her an instant message about certifying her time, and she complained about that. That's not harassment either, so the quantity of allegations is not significant here, particularly where the vast of the complaints are not even harassment, have nothing to do with sexual harassment, and certainly do not make out a case of hostile work environment. This court has affirmed the granting of summary judgment in other cases with facts far more egregious than the ones in this case. For example, Clark v. UPS is a case decided by this court in over a period of two and a half years that included vulgar sexual jokes, and the alleged harasser twice placed a vibrating pager on her thigh, pulled her overalls to see her thong. The court ruled that that was not severe or pervasive, and summary judgment was affirmed. The same is true in Bowman v. Swanee State University, and both of these cases are cited in Social Security's brief. That case was decided in 2000. There were four incidents over four years. A supervisor was rubbing the shoulders of the plaintiff and grabbing the plaintiff's butt, excuse me, your honor for the language, telling him that she controlled his ass and would do whatever she wanted him to do, telling that plaintiff to come over to her house, get into a were not severe or pervasive, and the court affirmed summary judgment in those cases. So when you compare and contrast Clark and Bowman to Ms. Scarborough's case, she certainly does not meet the bar of severe or pervasive, and she's not entitled to a trial. I would like to correct something that was discussed a minute ago, a comment made by Mr. Phillips to Ms. Scarborough. It was characterized as a discussion about her marriage or an inquiry about her marriage, and that's not the case. Mr. Phillips approached Ms. Scarborough, really with each of the incidents in question in this case, all of them had to do with his marriage. All of his comments centered around the troubles he was experiencing in his marriage. When he approached her and asked about her husband, who was a contractor in Afghanistan, he was teary-eyed. He was literally crying and asked Ms. Scarborough, how does your husband deal with being away from the children? Because he was experiencing so much trouble in his own marriage. That wasn't a secret because other management knew that he was experiencing trouble. As your Honor pointed out, he thought they were friends. He thought that she was someone he could talk to about this. Ultimately, that wasn't true, and she complained. Management counseled Mr. Phillips about speaking with Ms. Scarborough. In fact, they said, please limit your discussion about your personal business. The record reflects that no additional comments occurred after October of 2012. So the comments ceased, and the comments were not based on her sex or had anything to do with sexual harassment. I'd also like to move to the alleged incidents in the parking lot that your Honor brought up. It's important to note that each of those alleged incidents, there was no interaction between Mr. Phillips and Ms. Scarborough in the parking lot, no interaction whatsoever. Keep in mind, this is an employee parking lot, so Mr. Phillips has the right to be in that lot, coming to and fro, and parking there the same way that she does. He testified that he would leave his cell phone off while he was at work, and when he would enter his car in the evenings, he would check his text messages, his voicemails, and maybe return phone calls. And so any accusation that Ms. Scarborough has that he was, quote, waiting for her is completely incorrect. There's nothing in the record to support the notion that he ever waited for her. And in fact, there's no evidence to rebut his statement that he checked his cell phone, checked his messages, and returned phone calls. So that accusation is incorrect, and this court should not reach the conclusion that Ms. Scarborough reaches, which is that Mr. Phillips must have had some sinister motive every time he was in his car. There's no evidence of that, and that should not be considered any further by the court. Other instances that Ms. Scarborough and Mr. Phillips worked together from 2009 to 2012 without any incident at all. And so these lunch meetings were customary. They were usual, and after the open marriage comment that Mr. Phillips made to Ms. Scarborough in September 2012, she began to get uncomfortable about going to lunch with him. When she expressed that to management, they told her she didn't have to go, or they would ask Mr. Phillips not to go. So they always made concessions for Ms. Phillips to make sure that she was comfortable. I'd like to address the, really the management response all the way around in this situation. When Ms. Scarborough complained about the comments, Mr. Phillips was counseled, the comments ended. Management functions, as I just mentioned, the lunches, there was a holiday party she chose not to attend. There was no problem with that. Management supported her decision. When she complained about an incident in the parking lot, management pulled the video surveillance, they investigated, they made sure that nothing was awry, and in fact, nothing was awry. And so that was followed through with. Management even went as far as to pull certain responsibilities from Ms. Scarborough so that she would not have to interact with Mr. Phillips. Those were some medical reviews. They pulled those, and in her deposition, she testified that she believed they had pulled those so that she would not have to interact with him. She asked about staying in her cubicle. She didn't want to have to rotate cubicles in the event that she may be closer to Mr. Phillips, and management granted that request. When she complained that Mr. Phillips was staying in the office past 530 when she needed to close, management counseled him and told him, don't stay in the office anymore. Every single time that she made a complaint, and I want to add the last one as well, when she complained that he had contacted her about certifying his time, certifying her time, excuse me, even though she testifies he was responsible for doing that in the absence of management, she still complained, and management changed the procedure so that she would not have to interact with Mr. Phillips. At every turn, management took action that was necessary. They took prompt corrective action, which is required under the fifth prong of the employer liability prong of the hostile work environment case, but even if the court does not get to employer liability, the harassment is not severe or pervasive. There are no facts or there's no facts to demonstrate that the harassment was severe or pervasive. As I mentioned cases before that were far more egregious than this one, and this court, excuse me, affirmed a summary judgment, and this court should also affirm a summary judgment in Ms. Scarborough's case. So if there are no further questions at this time, then I will yield the remainder of my time. All right, any rebuttal? You're on mute and we can't hear you, counsel. My apologies, your honor. Okay. Whether or not the subject matter is severe or pervasive is a subjective standard, and that is that you need to take the plaintiff and the plaintiff's consideration whether or not she found the comments in the workplace harassing or offensive, and again that is back to the Gallagher case. Now what is potentially at issue is the objective standard also set out by Gallagher, and that is where the environment is objectively hostile, and in considering the objectively hostile environment, the Gallagher opinion clearly states that you take all of the totality of the circumstances in reviewing whether or not a reasonable person would find the work environment objectively hostile, and that is what the district court failed to do. It conflated both of those standards into one, and that is what we are appealing here today. The subjective standard of whether or not my client found the work environment severe and pervasively hostile is clearly established by the record. The objective findings of what we have here are 15 incidences that she is complaining of and clearly defined in the record. This court talked about the first instances where we have the discussion of the open marriage and whether or not my client, he came to her and said that I considered you a good friend. That is in her deposition at pages 29 and 30 of her deposition in the record, and I quote from it and she said that he said that he considered me a good friend and he wanted to show or tell me how much he considered me a good friend. He invited me back into a room and he said that he and his wife were having issues and that his wife wanted to have an open marriage, and he then asked if my client knew what an open marriage was. She then thought the whole situation to be inappropriate and left the room and totally left the room, and that bears itself out on pages 29 and 30 of her deposition. But before she left the room, didn't she answer no, and he did not attempt to explain to her what it was or make any further comments, did he? She was asked what her response was. She said I didn't know what that was, but it sounded like he needed legal advice. What was his response? We walked out, I walked out, that was it. That was it. To my recollection, that was it because I was uncomfortable at that point. I was uncomfortable with what she said. Thank you. Pages 29 and 30. And then concerning, and then if you take the totality of the circumstances and then follow that up with these incidents in the parking lot. Now council says about the incident in the parking lot and she reported to the supervisors. The supervisors said let's give it a little bit of time and we will look at a videotape, a videotape which they could no longer find. They then said well we talked to the security guard and the security guard didn't see anything and therefore it was all dropped concerning the incidents in the parking lot. So if you again look at the totality of the circumstances surrounding each one of these events. Then what are the totality of the circumstances in that? I mean, she complained, they checked with the security guard, he said nothing happened. What else do you want him to do? Well, but that is their report. That is their report of what happened. They're still, why is he in the parking lot with my client? Why is he there observing her? Well, now wait, you said why is he in that parking lot? Ms. Jones explained to us that this is a common employee parking lot. No employee is required to just hop in their car and immediately speed off. If somebody wants to sit in their car, meditate, make a call or whatever, they can do that. Just because two people happen to be in the parking lot at the same time, what is the problem with that? No, your honor, totally correct. However, when he came by and drove up to the plaintiff and she had a witness there with him and she was approaching him, he then violently drove off and that's clearly. What does that mean, violently drove off? Did he spend hours leaving? Well, no ma'am, no ma'am. According to the record, she said she hurriedly, I should say, hurriedly drove off. He hurriedly drove off is what was stated in her deposition. Concerning the Clark case cited by counsel, I really, the court, to take a heart, there were two plaintiffs in Clark. The plaintiff, one plaintiff who summary judgment was upheld, there were only two or three incidents of harassment. The Clark plaintiff, there were 15 in various incidences of harassment and her case was allowed to proceed. So the defendant's, the appellant, excuse me, the appellee's reliance on Clark is mistaken and should be disregarded by any analysis by this court if a close look of the Clark cases is performed. And I see I'm out of time unless the court has any further questions. Apparently not. Thank you for your arguments and the case is submitted.